# **EXHIBIT A**

**RECEIVED**
E-Filed 3/29/2021

# COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss                \                Superior Court
                                       Civil#

                                                   2182CV00280

|  |  |
|---|---|
| KYROS LAW GROUP LLC | ) |
|          Plaintiff | ) |
| v. | ) |
|  | ) |
| Michael Patrick Feeney, and | ) |
| Feeney Law Firm, | ) |
|          Defendants | ) |
|  | ) |

## **COMPLAINT**

I      STATEMENT OF FACTS

1.      Konstantine Kyros ("Kyros") is a Massachusetts lawyer who is the managing partner and owner of Kyros Law Group LLC ("KLG,") a law firm, having a primary place of business in Hingham, Massachusetts. KLG is the Plaintiff herein.

2.      Defendant Michael Patrick Feeney ("MPF") is a nominal owner of Feeney Law Firm, LLC ("FLF") having a primary place of business in Quincy, Massachusetts.

3)      The actual party in control of FLF is a non lawyer Christina Feeney (CF), who holds herself out to the world as the "Chief Executive Officer" of FLF. She has effective control over its marketing campaign, its management, goals, finances and all other meaningful aspects of the firm's business.

4)      Defendant Feeney Law Firm, LLC ("FLF") is a Massachusetts Limited Liability Company, formed on 12/17/2015, FLF, whose nominal shareholder is Michael Patrick Feeney of Quincy, MA, husband of Christina Feeney.

5)     The Sweet Feeney Marketing Group, LLC (SFMG) is an organization
formed by Christina Feeney (CF) to provide marketing and logistical
services to KLG. MPF worked for SFMG at times from 2011 through part of
2016, and owed a duty of loyalty to KLG.

6)     The Kyros Law Group, LLC, from at least 2010 onward, conducted
large scale national advertising campaigns using media outlets such as
television and internet search engine placement of websites to obtain clients
through targeted campaigns. Such campaigns provide Clients to the legal
industry and serve to alert people of their rights they might not otherwise
exercise. An example of such a campaign was conducted on behalf of
injured National Football Players who filed suit for compensation as a result
of concussions, among other football injuries.

7.     From January 1, 2011 until January 1, 2016 SFMG under the direction
and control of CF, was engaged to conduct legal marketing services for
Kyros/KLG pursuant to a written contract, dated 1/1/2011 and attached
hereto as Exhibit A (the "Contract"). That contract formed the beginning but
not the end of the relationship among Kyros, SFMG, CF, and later both
Michael Patrick Feeney and FLF.

8.     As an integral part of those marketing services Defendants SFMG
under the direction and control of CF, was responsible for overseeing the
advertising campaigns and tracking the spending upon the campaigns,
including matching the results of the campaigns with the data gathered.

9.     Under an agreement signed before Exhibit A, which is set forth as
Exhibit B, KLG, SFMG and CF agreed that KLG would pay for the
customization of a data base to include analytics required by KLG to
efficiently run and market its advertising campaigns.  The paid for materials,
owned by KLG as a work for hire were used by SFMG to create the KLG
Database.

10.   KLG was charged and paid over $100,000 for these analytic
customizations. There never was any intent that KLG would pay for
customizations and analytic software for the benefit of SFMG. None of the
agreements among the parties provide that KLG will pay for any software or
software tools for the benefit of KLG—such would be pointless and contrary
to KLG's interests.

11.    The data analytics being an integral part of the Database (including all data therein and the interrelationships thereof), all paid for by KLG, and owned by it, results in extremely effective marketing tools – knowing what campaigns resulted in customers and how the customers responded – whether to a web site, video advertisement, or search engine "keyword" or some combination of those tools and others employed by the marketers of professional services. All of this information is confidential proprietary information belonging to KLG and paid for by KLG. It was work commissioned by KLG and paid for by KLG and as such, its copywrite was and is owned by KLG as a "work for hire". The Defendants were aware of the rights of KLG and the value of the materials.

12.    Knowing how to cost effectively acquire qualified customers is a key metric needed by any marketer of legal services, and a key variable considered by any consumer of those services. Millions of dollars of campaign money has been spent acquiring this information and know how. The utility of these metrics is recognized in paragraph C to the "Statement of Work" attached to Exhibit C.

13.    The variables of the database which may be related through associating and evaluating the inter-relationship of the different data types gathered (and when and how they were gathered) provides the basis of the science of "data analytics" as that discipline is utilized in legal marketing, and as is known to CF, SFMG, and the Defendants.

14.    Results such as "cost per inquiry", "cost per signed case" and the most efficient and effective channels, times, and techniques of customer acquisition are very valuable and proprietary information, constituting the essential intellectual property and trade secrets of the Kyros Law Group LLC. SFMG, CF, and the Defendants well knew that KLG never intended the data analytics paid for by KLG being utilized by CF and/or SMFG or any other entity or person in any competing business. KLG took reasonable precautions to prevent ownership or usurpation of such data, including the insertion of a non-compete clause in the KLG/SFMG contract, as known to the Defendants.

15.    The Contract with the SFMG, being run exclusively by CF, included in large part the maintenance of the Database with the customizations paid for by KLG so that KLG would have access to the data analytics needed to grow and prosper its business and further to serve its customers and those of

3

co-counsel. Neither CF, nor SFMG, nor the Defendants or anyone else, apart from a written agreement with KLG, could acquire any right, title, or interest in KLG's "work for hire", its Database, or the data contained within the Database, including any analytics.

16.   All of the materials, however described, obtained through the marketing campaigns is and always was intended to be the sole property of the Plaintiff (and or Atty. Kyros), for which the Plaintiff paid, and which was known to the Defendants.

17.   The Defendants and each of them at all times knew that Kyros and KLG relied upon the Defendants maintaining the secrecy and proprietary nature of the KLG data and its paid for analytics, and continuously induced the Plaintiffs to believe that secrecy was being maintained.

18.   But for the representations of SFMG and CF that the KLG database and its analytics was and would forever remain the proprietary information of KLG and Kyros,  SFMG/CF would never have been hired or given any campaign money by KLG.

19.   When SFMG and CF accepted the money from KLG at Kyros direction, CF and SFMG intended that Kyros and KLG rely upon their representations of secrecy, and further the swift availability of the information to Kyros and KLG.

20.   The Defendant Michael Patrick Feeney was brought into the SFMG business by CF in order for him to learn the business, and it is now known, to assist CF in developing a scheme to steal KLG's proprietary database and intellectual property, and to employ the valuable data and analytics in a new business run by CF and MPF.  MPF always knew of the Agreement with KLG and the obligations it imposed.

21.   The Contract, Exhibit A, has now expired by its terms, but obligations remained upon CF and SFMG past the end date to preserve, protect and turn over the database of files, contacts, legal documents, correspondence, billings, prospects and other lawyer-client materials essential to the practice of Kyros and required by his office and his co-counsels to maintain his practice, the interests of his Clients and customers. These materials also include all of the data analytics and algorithms in the database needed to generate the marketing decisions of the law firm.  These delegations were

4

known to CF, SFMG, MPF and FLF. Christina Feeney, for example, has argued to the Court in an ongoing litigation that Exhibit A remains in effect even to this day.

22.     CF and her marketing company SFMG worked exclusively for Kyros and were tasked to implement a large-scale marketing and client retention platform for the exclusive use of Kyros and KLG, and no one else.

23.     During the term of the agreement Kyros and his company KLG paid CF and SFMG millions of dollars both as fixed fees for services as well as monies given to oversee and spend prudently for the specific purpose of attracting new clients to the firm, and developing the needed data analytics for marketing purposes.

24.     The prudent and efficient spending of advertising campaign funds is a well-known industry standard and metric for determining the success of campaigns. The success of a campaign determines the reputation of the marketer, the profitability of the referring firms, and therefore the likelihood of repeat business, all as known to the Defendants.

25.     CF in her capacity as the Manager of SFMG (under contract with KLG) was in charge of much of the day-to-day managing and spending of these substantial budgets and funds, for the purposes for which the funds were intended. CF, MPF, SFMG and FLF knew very well at all times that Kyros, and KLG were relying upon CF to exercise the prudent spending of client law firm funds for the purposes for which they were obtained, and at all times knew that Kyros/KLG were relying upon CF for this purpose and paying CF and SFMG for this purpose, and that the reputation and success of KLG depended upon the proper utilization of campaign funds. MPF worked at SFMG and was under the control of CF.

26.     KLG during the five years of the Contract, retained through the advertising campaigns, word of mouth and otherwise, thousands of clients who desire to pursue various injury claims. These Clients belong to KLG and/or to the Law Firms to which Kyros referred the matters based upon the campaigns conducted. They do not belong to the Defendants or to Christina Feeney, or to SFMG.

27.     Per the marketing agreement, all of the KLG attorney- client information which includes all communications with the firm, all client

5

personal information including Social Security numbers, medical authorization forms, filings, statute of limitations tracking, along with marketing data, tracking the source of these clients was and remains housed in a "Salesforce" database (a well-known "cloud based" service). That material remains confidential to this day.

28.   "Salesforce" is nothing more than a base program into which one enters data, such as "Excel" or "Word". The program contains numerous options and analytical tools available to any subscriber. Neither CF nor SFMG or the Defendants brought any software tools of any value whatsoever to the Salesforce proprietary program. The "value" is in the gathered data which Kyros/KLG paid for in full as a work for hire, and the mining of that data to obtain results important to KLG customers who wanted to explore retaining KLG for marketing campaigns, all as known to CF, SFMG, and these Defendants.

29.   The intellectual property, confidential information, and trade secrets of Kyros/KLG was and is contained in the Salesforce database consisting of, but not limited to search engine key words, tracking data, advertising materials, data concerning the effectiveness of advertising programs and follow up with Clients. Financial data program budgeting, expenses and numerous internal communications and other data are also contained within the database, as well as interrelationships among the entered data which allow the generation of useful reports necessary to the law firm and its day-to-day operations, particularly marketing and efficient use of Client funds, all as known to the Defendants.

30.   During the agreement the database and all customizations were entirely paid for by KLG and owned by KLG. No one had the right to transfer any database owned by KLG, including its entire content and analytics, to anyone including these Defendants, as the Defendants knew.

31.   As known to the Defendants in this matter, CF and SFMG only managed the data base on behalf of KLG by keying in Client contact data, case information, advertising expenses and so on, into the database. Although and the "lease" to the KLG database was nominally held by CF/SFMG, that holding is only a matter of convenience since it was managed on behalf of KLG. Neither CF, SFMG, or any Defendant herein held any interest whatsoever in the database paid for by KLG, nor could any

of them obtain good title to same, absent a purchase agreement with Plaintiff. No such purchase contract exists or ever has existed.

32.    The Agreement provides that KLG is to receive at regular intervals a full working copy of the database and to have access in every respect to the information he and KLG and its Clients paid for, and which is essential to the conduct of KLG's business, all as known at all times by CF, SFMG, and the Defendants hereunder.

33.    Instead of KLG receiving the working copy, CF/SFMG stole the database and knowingly transferred it to the Defendants, as a part of a well organized conspiracy to steal Plaintiff's intellectual property trade secrets, database, copyright, and other valuable information to benefit themselves, as alleged herein, which they have continuously covered up.

34.    KLG paid for all the marketing costs, all of the software, database, websites, television advertising, call handling, mailing, staffing, rent, insurance and nearly all the other expenses of Sweet Feeney Marketing Group during the relationship, and therefore owned same as was well known to the Defendants.

35.    Neither CF nor SFMG had during the term of the Agreement any proprietary rights to any of the work done for Kyros and KLG, and therefore they could not transfer any such rights to the Defendants, which the Defendants well knew.  Any such transfer was the transfer of stolen property over which no title may be obtained by the Defendants.

36.    Any work done by CF and/or SFMG (or other under their direction) was a "work for hire" and conferred no ownership rights in Feeney whatsoever. Feeney as a non-attorney, cannot own lawyer client information and is not entitled in any event to information paid for by KLG, and is not entitled to give access to anyone.

37.    The Salesforce database held as a nominee by CF for Kyros/KLG was paid for entirely by KLG along with bills paid by KLG to Feeney for numerous modifications, modules, and annual user licenses for staff and support for the database.

38.    In 2011 KLG paid SFMG at least $32,739.36 for the database and its support. SFMG billed and KLG paid $18,440.66 on 8/2/11 for renewal of

7

the Salesforce Database annual license,  KLG made additional payments to CF/SFMG on 9/27/11 for $2,413.65, on 11/1/11 paid $3,259.05, and again on 11/28/11 paid $3,456. CF presented these bills as pass through for Salesforce database costs which KLG paid. All this was known to the Defendants, one of whom is CF's husband and co-conspirator.

39.    In 2012 KLG paid SFMG $30,759.55 for the Salesforce Database annual license and related "database expense" charges.

40.    In 2013 the database charges paid by KLG to SFMG amounted to $24,931.02.

41.    Kyros did not pay CF/SFMG for the Salesforce license on which the Kyros information was to be stored in order that CF, SFMG, or anyone else, including these Defendants could develop a business of their own at Plaintiff's expense as the Defendants in this matter have known at all relevant times.

42.    In 2014 the Feeney/SFMG billing practices become more obfuscatory and the license and database were no longer identified on the invoices, nevertheless the database was in continuous use by the Firm and was KLG paid for all fees related to the Salesforce database and license.

43.    In October 2015 KLG paid CF $19,103.12 for Software and Online Services with a notation "Includes Salesforce yearly license renewal"

44.    KLG also paid for the August 2010 set up of the database under a memorandum of Understanding with a predecessor entity (that was effectively rolled into SFMG) called Sweet Marketing Group, a precursor to SFMG. KLG was invoiced in detail in September 2010 and paid $25,000 for that work in anticipation that the Salesforce database would be ready for use by his law firm some months before the commencement of the January 2011 marketing Agreement. These payments were not made for CF's benefit or to benefit her business SFMG, or for her husband's benefit, as she well knows.

45.    During the Contract CF for herself and for SFMG, sought to often escalate the expenses many of which Feeney sought outside the terms of the written agreement, with a lack of transparency which caused much friction with KLG, and which became an integral part of her plot to divert KLG's assets to a business to be set up and run by CF and MPF.

46.     For example, Feeney charged KLG monthly rent apparently for her residence and that of the Defendant MPF in Quincy Massachusetts – billed at over $3500/month. Such a charge is neither provided for in the contract and is manifestly preposterous and fraudulent, but the Defendants herein accepted the benefit knowing the charges were fraudulent and not allowed by the Contract.  The funds were laundered by CF through SFMG, and through the personal accounts of CF and MPF.

47.     When Feeney purchased a home for herself and MPF in Quincy, MA (where SFMG is located) she informed her then partner Andrew Sweet, upon his question of where the funds came from to make the down payment, that the payment came from money provided by KLG. Feeney took the funds for the down payment from SFMG from campaign funds received from KLG, thus laundering funds through SFMG for her personal gain (and that of MPF) and diverting those funds from the KLG business in violation of her and MPF's duties to KLG. Those funds benefited and to this day benefited both CF and her husband, Defendant MPF, and constitute evidence not only of misappropriation but also of the conspiracy of the Defendants.

48.     No such funds were paid by KLG to CF or MPF for the purpose of purchasing a personal residence for the Feeneys. Such a payment from the funds provided by KLG was a diversion of assets from the campaigns for which the funds were given to SFMG for specific purposes.

49.     Neither CF nor MPF had funds from which to purchase the home in Quincy. without fraudulently diverting and converting assets from funds provided by KLG. See for example Norfolk Registry of Deeds Book 33784 page 333 which is an IRS Tax Lien for unpaid Form 1040 taxes for the year 2014 in the amount of $130,959.27 – filed against CF and MPF for the very year in which they claim to have acquired a $750,000 home in Quincy, MA. The fraud was knowingly facilitated and money laundered through the accounts of CF and MPF, was artfully concealed by them, and only recently revealed through discovery in another case.  Defendants and CF engaged in a continuing cover up of their misappropriation and theft which continues to this day.

50.     Following the expiration of the five-year term of the agreement with SFMG on January 1, 2016 Defendant CF has undertaken to steal the property of Plaintiff Kyros in the form of the Kyros Law Group Salesforce

database, and instead has conveyed the stolen property to MPF and the Feeney Law Firm which CF heads and controls as its self-proclaimed "Chief Executive Officer". See Exhibit D.

51.   Both CF's declaration of herself as the "chief executive officer" of FLF, and MPF's acquiescence in same, violate Supreme Judicial Court Rule 3:06 (1)(e), which requires that managers of a professional limited liability company be owners of that company, and further that all owners must be licensed in the profession practiced by the LLC. Thus FLF holds itself out to the world as being run in a manner not in compliance with ethical rules, and further supports the control which CF enjoys and has enjoyed over the entire enterprise of SFMG and FLF, and which further jeopardizes the confidentiality of the KLG information including but not limited to trade secrets, intellectual property, and the Database.

52.   CF has personally instructed SFMG, MPF and the Feeney Law Firm not to provide a valid accounting of the Campaign funds as required by the contract for the specific purpose of covering up her diversion of KLG funds out of SFMG for the payment of her personal expenses and those of her husband, including the establishment and promotion of the Feeney Law Firm. This diversion was accomplished intentionally, wrongfully and without authority, and upon the knowledge and willing participation of the Defendants.

53.   The governing Marketing Agreement as known to the Defendants unambiguously confers ownership of the law firm database to Kyros (See Exhibit A page 3 paragraph 8) reads as follows:

> " **Intellectual Property.** (a) Except as set forth in the Statement of Work, Consultant [Feeney] hereby assigns to Client [Kyros] all right, title, and interest in and to any inventions (patentable or otherwise), discoveries, improvements or copyrightable works including, without limitation, the Deliverables (collectively, "Intellectual Property") which Consultant delivers or creates in connection with its performances of Services hereunder. At Client's expense, Consultant shall provide all reasonable assistance requested by Client in its protection of the Intellectual Property."

54.   The above passage is to be read in concert with the Statement of Work (Exhibit A Statement of Work to Marketing Agreement) that was attached

and incorporated into the original Agreement. This reads: "Consultant will create a database to log, monitor, and update the status of leads, along with capturing pertinent information on each lead or case." The database is a work for hire and belongs to Kyros.

55.    Deliverables are explicitly identified as the property of Kyros is defined as: Websites, Content. Database and Call Center. The database entry reads: "Consultant shall use Salesforce.com as the database and it will be maintained through an annual license. Technical support will be provided as part of the license fee." (See Exhibit A Statement of Work to Marketing Agreement)

56.    Per the contract paragraph 8b CF was required to turn the database over to KLG:

> "On a monthly basis, Consultant shall provide Client with a digital file containing a then current complication of the lead database exported in a standard available format that Client can upload to its own login so Client can access the database at any time."

57.    No such files complying with the contract were provided either during the term of the contract, nor to date. Instead, CF conspired with the Defendants to turn the stolen database over to them for their mutual profit, and to the detriment and financial injury of KLG.

58.    CF and her company SFMG, being in charge of the records in the Database obtained sole and exclusive access to the names of these players in violation of the Contract and the ethical rules pertaining to attorney-client communications. She is a non lawyer and has absolutely no reason whatsoever to keep KLG' materials and Client communications, or to keep Kyros/KLG's privileged attorney-client data, or to give these materials to anyone.

59.    Instead of turning over KLG's property to KLG, CF and MPF conspired both while employees of KLG, and thereafter to steal the KLG database and Client information for the benefit of MPF and the Feeney Law Firm, which they had intended to set up for the purpose of receiving and exploiting the stolen information.

60.    CF who had been vague in initial discussions, ultimately declared to Kyros that she would never turn the database over to him or to KLG. Kyros said it was his, he had paid for it and it was KLG's property and it was necessary to run his law firm.

61.    CF had, at the time the Agreement ended, no "business" she had only the documentation Kyros/KLG paid for and which belongs to Kyros/KLG. CF, MPF and the Feeney Law Firm, with CF as its "Chief Executive Officer" have conspired to steal and have actually stolen the Intellectual Property of KLG through theft of its database, and for the explicit purpose of soliciting KLG's customers in violation of the Agreement for the mutual profit and benefit of CF, MPF, and the Feeney Law Firm.

62.    Plaintiff KLG contends that CF has violated the terms and conditions under the Marketing agreement, both as written and as expanded in practice. KLG contends that laws of Massachusetts and federal law required CF/SFMG to restore Plaintiff's property that it contracted and paid for in it's entirely for over Five years, and NOT to steal same, and then turn it over to a law firm, Defendant FLF, which was established for the purpose of exploiting the stolen data, and to employ CF for the purpose of perfecting the theft and exploitation of the KLG database.

63.    The receipt and wrongful retention of the Kyros Law Groups database containing 63,910 names along with all of the law firms clients confidential data, social security numbers, retainers, files and financial, marketing data and associated analytics records is unlawful and has materially damaged KLG. Both Defendants were and remain knowing participants in the theft and exploitation of the stolen property belonging to KLG.

64.    For three years, commencing in approximately 2012, during the term of the KLG/SFMG contract, CF brought her husband MF into the SFMG business, and began to teach him the value and profitability of the marketing of legal services with respect to mass torts.

65.    CF and MF developed a plan to learn the business in which KLG was engaged and then do everything possible to seal all aspects of that business and appropriate it to themselves.  To that end MF began attending law school. At the very time he was attending law school, CF hired MF to "work" in the KLG business in order to learn what was of value, and to

enhance the money going to the Feeney Family, and to carry out the conspiracy.

66.   To enhance the operation and profitability of their conspiracy, CF instructed her company SFMG to bill for the personal expenses of MPF's attendance at law school including tuition, parking, and associated expenses, which was an illegally conferred benefit knowingly received by MPF.

67.   In November of 2015 Feeney's Husband, Defendant MPF passed the Massachusetts Bar and when the dispute with CF and KLG were pending, MPF established  the Feeney Law Firm, LLC for the purpose of receiving property stolen from KLG, particularly its intellectual property, Database, paid for analytics, client roster and contact information and all other material, including money, that would be useful in establishing a new law firm in conjunction with his wife and Chief Executive Officer, Christina Feeney

68.   Christina Feeney, in conjunction with and with the knowledge and approval of her husband MPF, appropriated to themselves the proprietary aspects and information in the Plaintiffs' database in order to put CF, MPF and FLF into the shoes of Plaintiff and to utilize the information that Kyros has paid literally millions of dollars for to establish a referral law business. husband's license, including KLG's proprietary and confidential client information.

69.   CF, MPF and FLF utilized the information contained in Plaintiff's database to illegally solicit Plaintiff's customers, with information and expertise developed by KLG, paid for by KLG, and diverted from SFMG by CF for the benefit of herself and her MPF, and in knowing violation of the applicable Contract and law.

70.   CF and SFMG have denied they transferred the database and its contents to MPF and FLF, but during 2021 Plaintiff has received verification from third parties, and recent disclosures made in discovery by CF in another matter (Norfolk Superior #1682CV00100), it has been confirmed that CF has been utilizing the database and its unique characteristics for the benefit of MPF and FLF (and therefore herself), and has thus stolen and conveyed the intellectual property and trade secrets of KLG to FLF.

71.   FLF is currently utilizing the stolen property of KLG to enhance the viability and profitability of FLF and to attract customers, including KLG's customers.

72.   FLF has been in continuous use of the stolen property of KLG to enhance the viability and profitability of FLF and to attract customers, including KLG's customers, for the benefit of FLF, MPF and CF, since shortly after FLF was formed.

73.   The stolen property consists of, among other things:

a)  The names, addresses and contact information for the KLG clients, including both other law firms and individuals being represented under co-counsel agreements;

b)  All of the campaign data on advertising campaigns, including the amounts spent, the purposes for which the money was spent, the vendors upon whom it was spent and the products produced;

c)  The proprietary analytics developed in a custom manner for KLG, and for which KLG paid and owned as a work for hire;

d)  Proprietary analytics paid for by KLG and owned by KLG, including the results of these analytics and the interrelationship of the analytics with the vast data in the Database, which results in valuable trade secrets, consisting of, among other things, extremely valuable information on what types of advertising work for what types of populations and campaigns, and at what cost per customer.

74.   The use of the Database and its analytics and trade secrets, all stolen from KLG, caused material damage to KLG and its ability to track, maintain, retain and serve its customer base, as well as to grow that base.

75.   The Database stolen from KLG contains proprietary information of its Clients. Since CF and SFMG deny transferring this stolen property, it is a reasonable assumption that they either did transfer it, or still possess it, (or both). Under any of those possibilities, CF, MPF and FLF all know that they had no right to access and use the confidential client data of another law firm, and indeed the Agreement with CF/SFMG protects and preserves the use of this data to the exclusive use of KLG.

14

76.    In each and every instance KLG took reasonable steps to preserve the confidentiality of its trade secrets, including the terms of the Agreement, and further through other litigation (Norfolk Superior #16CV00100).

77.    CF is not a lawyer and once she ceased to be affiliated with KLG, had absolutely no right to access KLG's private Client information in any manner or to install herself as the "Chief Executive Officer" of a professional limited liability Company formed in Massachusetts. See SJC Rule 3:06(1).

78.    The term "chief executive officer" is defined by Merriam-Webster's on line dictionary as: " the person who has the most authority in an organization or business". See Chief Executive Officer | Definition of Chief Executive Officer by Merriam-Webster (merriam-webster.com)

79.    MPF is currently an attorney in Massachusetts and became such just before the Agreement ended, and therefore knows well that neither he nor FLG, nor CF are entitled to access the private information of another law firm and to utilize the private information of those clients for his own benefit and profit, or for that of his wife, let alone to assist in a conspiracy to steal that information.

80.    CF as the manager and sole owner of SFMG is fully responsible for the actions which SFMG takes under her control and direction. SFMG has no way to undertake its business except at the direction and control of its owner.

81.    MPF as an owner (at least in name) of FLF, is responsible for his actions and those of FLF undertaken on his behalf and for his profit.

82.    The statements and representations of SFMG that were made by CF not only bind SFMG, but also bind CF.

83.    The statements, representations, and actions of CF in her capacity as "Chief Executive Officer" of FLF bind CF and FLG. The knowledge possessed by CF in her capacity as owner of SFMG and employer of MPF are attributable to MPF and FLF, especially where they utilized that knowledge and actions for profit and thereby caused damages to KLG.

84.    As is set forth in paragraphs above of the Complaint, CF and the Defendants have unlawfully deprived KLG of its property first by personally directing SFMG to withhold it, and then to transfer it as stolen property to or for the benefit of FLF. SFMG's retention and theft of the database is designed to profit CF and the Defendants and conceal the false campaign fees that may be in the database, which were used to fund the conspiracy of CF and the Defendants.

85.    On 1/6/16 in accordance with Exhibit A of the Complaint, and in writing to her counsel 1/19/16, demands were made for the database along with an accounting of the monies the Defendant had received from Kyros. In violation of the terms and conditions of the agreement and both Massachusetts and Federal law, the Defendant CF refused to transfer the database and/or neglected to provide any accounting, and instead gave it to MPF and FLF as stolen property, to be concealed and utilized by them.

86.    According to the documents submitted with the Complaint, realleged and incorporated into this Amendment, the Defendants are party to an outrageous scheme to deprive a law firm of its main asset, and to receive and conceal stolen goods.  Their actions violate all legal and ethical standards and duties associated with any contract for professional services, especially those associated with licensed practice of law.

87.    Such an outrageous deviation from the Agreement, failure to provide the database or meaningful access to it, multiple breaches of the contract including failing to account for monies, departure from the requirements of good faith and fair dealing, coupled with outrageous disruption of a law firm and interference with attorney-client relationships and CF operating in a manner designed to damage Kyros/KLG with  co-counsel, all give rise to conclusion that CF unlawfully retained the database, and directed SFMG to unlawfully retain it, and has been defrauding and misleading the Plaintiff about its contents, and diverting its opportunities for her personal gain and that of FLF and MPF.

88.    As above alleged, CF and Defendants repeatedly represented to the Plaintiffs and each of them that they understood the highly confidential nature of the relationship into which she was entering, and that the metrics created from the advertising campaigns were proprietary and confidential and would damage KLG's business if disclosed.  MPF knew at all times that

16

neither he nor his law firm had any right to KLG's Database or any portion of it.

89.   Pursuant to paragraph 9 of Exhibit A (Agreement") the Defendant SFMG had a duty to "keep confidential" all information which it obtains under the Agreement and it operation. Such information may not be "used or disclosed" by SFMG both during and after the term of the agreement.

90.   MPF and FLF were at all relevant times aware of the requirements of the Agreement, aware that KLG was the owner of the Database, and they at all times undertook through conspiring with CF and otherwise, to conceal their use and possession of the stolen goods, and KLG materials.

90a.   Based upon the representations of Defendant Feeney at the time Exhibit A was executed, and repeatedly thereafter until the final breakdown in communications late in 2015, Feeney repeatedly represented that she was maintaining the data base for KLG's benefit and fully understood that KLG owned the database and its contents, and the customizations that KLG paid for –which were and are all of the customizations that exist in the data base.

90b.   It was based upon the wording of the contract negotiated with Feeney, and her repeated representations that KLG paid for the data base, its maintenance, and the Salesforce license which stood in SFMG's name as a straw for KLG and for no other reason.

90c.   But for Feeney's representations to Kyros and to KLG, KLG would never have retained Feeney or SFMG for any purpose. KLG knew that substantial "campaign" money would be gathered and very valuable metrics created as a result of the data entered into the data base.

90d.   Since KLG's intent, as known to Feeney, was to obtain advertising money from law firms wishing to conduct national campaigns (at the time of Exhibit A, mesothelioma campaigns) and to build a data base of valuable and proprietary information, there would be no point whatsoever to have hired SFMG or any other company and give them millions of dollars to develop a data base which that company or individual would later divert to personal use or to claim ownership over. Feeney knew this, discussed it with Kyros, and asked him to repose his trust in her to honor the contract and her representations.

90e.   Additionally, Feeney fraudulently placed her husband on the payroll as a "full time" employee in 2013 and 2014 while he was also a full-time law student and in fact devoted little if any time to KLG's work, thus diverting KLG campaign assets again to personal use.  Defendant MPF knew this, but took the money anyway.

90f.   On or about the first quarter of 2020 Plaintiff was able to confirm that MPF and FLF was doing business with a Kyros customer that they had solicited with information from the Kyros data base – the Flint Law Firm.

90f.   Under all Counts below, Plaintiffs allege that the Defendants attempted to conceal their activity in order to hide the damages they were causing to Plaintiffs and have engaged in the hiding of their activity through a concerted campaign of disinformation, money laundering of business expenses through personal accounts, establishing straw and sham entities for the purpose of hiding interest and perfecting the acquisition of what has been stolen from the Plaintiffs, all as alleged above and below, and as a consequence of such, it was not reasonable for the Plaintiffs to discover this activity before it was conclusively unearthed by the Plaintiffs' expert a few months ago through the acquisition of correspondence in another matter, all as known to the Defendants.

## COUNT I – Receipt and Wrongful Use of Stolen Goods

91.   Paragraphs 1 through 90 above are re-stated as if fully set forth herein, including all Exhibits, including the Exhibits attached, which are incorporated by reference herein.

92.   At all relevant times hereunder MPF, CF, and SFMG conspired to knowingly take the property of KLG described above in paragraphs 27-41 and to transfer it to FLF for its and their use and profit to the detriment of KLG, and further to conceal the theft on a continuing basis.

93.   The conspiracy has been a continuing enterprise and a continuing concealment from the day of its beginning through the date hereof. The actions of the Defendants, CF and SFMG are not solitary and isolated actions, but are a part of a well-crafted and continuing conspiracy to steal valuable property and, conceal it from its owner, and use it for the benefit of the Defendants and CF and to the detriment of KLG. The use of the stolen

property continues to this day, and continues to cause damage to this day, and therefore is an ongoing nefarious and wrongful enterprise.

94.    The Defendants cannot obtain good title to stolen property under Massachusetts law. All property belonging to KLG and stolen by CF and SFMG and turned over to MPF and FLF still belongs to KLG, and no title to same can be received by MPF and/or FLF.

95.    The Defendants, by refusing to turn over to KLG, the Database, the Intellectual Property and the Trade Secrets, including all analytics,  but instead conspiring with CF to hide them and to surreptitiously utilize them to undermine KLG's business and promote the business of FLG, continue to damage KLG to this day, ands continue their wrongful acts and concealment of the stolen property.

96.    SFMG as directed and controlled by Defendant CF, instead of maintaining the confidence of KLG as required by Paragraph 9 of the Agreement (Exhibit A to the Complaint, incorporated by reference herein) diverted and used that information for her own personal benefit and for the express purpose of benefiting her husband MPF and his newly established law firm FLF, and thereby to compete with KLG and put KLG out of business by appropriating its Clients and preventing its ability to communicate with its Client base, or to track its fees or cases.

97.    The Feeney Law Firm registered its web site in November of 2015 and began soliciting KLG's Clients, a practice which is an ongoing wrong which continues until this day, but which began while MPF was still working for KLG with his wife CF, under the auspices of SFMG.

98.    This theft of property, together with the theft of the Database, Trade Secrets, and Intellectual Property, has caused KLG suffer great monetary damage.

99.    Wherefore all stolen property of KLG must be returned by FLF and MPF to its rightful owner, KLG, forthwith, and FLF and MF must cease and desist from utilizing such property or any purpose whatsoever, or from maintaining a copy.

100.   A mandatory injunction should issue ordering the turn over of the stolen property and/or any property obtained through a violation of the Agreement by CF and/or SFMG.

101.   A further permanent injunction should issue forbidding MPF and/or FLF from using any property of KLG that was stolen from KLG and/or any property obtained in violation of the Agreement by CF and/or SFMG.

102.   In addition, it is hornbook law in Massachusetts that any profits earned upon stolen property must be accounted for and turned over to the rightful owner of the property. Accordingly, all money earned by FLF in any way derived from the use and employment of the stolen property must be accounted for and turned over to KLG, together with interest at the rate as provided by law, and the cost of obtaining such accounting and money, including all reasonable attorneys' fees.

## COUNT II -   Interference with Prospective Advantageous or Business Relationships

103.   Paragraphs 1 through 102 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, including the Exhibits attached, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear below.

104.   Plaintiff had and has a right to continue its relationships with its Clients and to have the information in its database in order to successfully develop relations with both old and new Clients, including but not limited to the use of the data analytics and Database stolen by CF and SFMG and handed over as stolen property to MPF and FLF.

105.   By its actions as described herein, MF and FLF have substantially, knowingly, and materially interfered with the advantageous and prospective business relations of KLG. Such interference, as described in the particularized allegations incorporated herein, was and remains ongoing, intentional, unlawful, malicious, and intended to achieve an unlawful purpose. The interference has been continuing from its commencement until now, as an ongoing activity.

## COUNT III - Continuing and ongoing violations of the Computer Fraud and Abuse Act, 18 U.S.C. 1030 et seq.

106.   Paragraphs 1 through 105 above are re-stated as if fully set forth
herein, including all Exhibits, including all Exhibits, including the Exhibits
attached, which are incorporated by reference herein. Also incorporated by
reference are the allegations of the Counts which appear below.

107.   MPF initially and FLF subsequently, utilized computers paid for by
KLG to store and manipulate the property stolen from KLG, particularly the
Database and its analytics (owned as a work for hire) to the advantage of CF,
MPF and FLF. The Defendants cannot obtain any title to stolen property.

108.   The KLG proprietary information was intended to be utilized only by
KLG for its duly authorized purposes, that of promoting the business of
KLG and keeping track of its customer base, its legal cases, and its
advertising campaign analytics, and storing its trade secrets.

109.   CF, assisted by and in conspiracy with the Defendants, improperly
accessed the Kyros database and stole its contents, transferring the KLG
materials to and for the benefit of MPF and FLF. MPF and FLF downloaded
and otherwise transferred and utilized the KLG Database and proprietary
information to establish a competing entity and to steal KLG's trade secrets
and for which he had paid substantially more than $1 million.

110.   The unlawful and intentional conduct of the Defendants caused
damage and losses to KLG substantially in excess of $100,000. KLG used
its Database, trade secrets, and proprietary information to conduct business
over numerous States of the United States affecting interstate commerce.

111.   The use of and the theft of KLG's Database, trade secrets, and
proprietary information, which was stored in digital form in the Data base,
by the Defendants exceeded all authorizations to them (FLF having no
authorization whatsoever), all as known to the Defendants.

112.   The intentional and malicious wrongful conduct of the Defendants has
been a continuing activity, and the Defendants despite repeated demand,
have refused and neglected to return the stolen digital property. Their
wrongful behavior and violations of law continue until this day.

113.   As a result, the Plaintiff has been required to hire a forensic expert and
investigator at great expense, to attempt to determine the damage. It has

21

been impossible to reconstruct the Database and the Plaintiffs have suffered substantial damage as a result, reasonably estimated to be in the hundreds of thousands of dollars.

113a. Such violations of 18 U.S.C. 1030, as described in the particularized allegations incorporated herein, was and remains ongoing, intentional, unlawful, malicious, and intended to achieve an unlawful purpose. The interference has been continuing from its commencement until now, as an ongoing activity, and continuing enterprise which has been intentionally concealed by the Defendants.   Violations may be enforced in either State or Federal Court, as for example, the RICO Act.

## COUNT IV -   Chapter 93: 42 and 42A Misappropriation of Trade Secrets

114.   Paragraphs 1 through 113 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, including the Exhibits attached, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear below.

115.   M.G.L. c 93 Section 42 provides, inter alia, that whoever steals, unlawfully takes, copies by fraud or deception, obtains from any person or corporation, with intent to convert to his own use, a trade secret, regardless of value, shall be liable to said corporation or individual for damages up to double those found. The statute defines a "trade secret" as including, but not limited to, anything tangible or intangible or electronically kept or stored, which constitutes, represents or records secret merchandising or management information, procedure, or improvement.

116.   The Defendant MPF has a legal duty not to disclose to third parties, such as Defendant FLF any confidential information and/or trade secrets obtained during the course of his employment with KLG, and not to convert those trade secrets for his benefit or that of FLF or CF, or anyone.

117.   In conspiring to steal and facilitating the theft of KLG's proprietary information, Trade Secrets, and electronic Database, the Defendants acted maliciously, in bad faith, and to generate profit for themselves, resulting in consequent significant financial damage to Plaintiff, and an unfair and unconscionable advantage to the Defendants.

118.   In disclosing KLG's proprietary information, Trade Secrets, and electronic Database to FLF the intent of MPF was and remains to harm KLG and to benefit MPF and FLF. This has been an ongoing and continuous activity, continuing to this day as knowing, wrongful and malicious conduct.

119.   In the light of the highly competitive nature of the mass tort business of KLG, unless FLF is enjoined from the use of the stolen information, damage to KLG will continue to accumulate.

120.   There should issue a mandatory injunction requiring FLF and MPF to return the stolen goods, without copy, and further to cease and desist using the stolen goods for any purpose whatsoever.

120a. Such violations of G.L. c 93:42 and 42A, as described in the particularized allegations incorporated herein, was and remains ongoing, intentional, unlawful, malicious, and intended to achieve an unlawful purpose. The interference has been continuing from its commencement until now, as an ongoing activity, and continuing enterprise which has been intentionally concealed by the Defendants.

121.   Further, an award of damages, to be doubles in the discretion of the Court, should be awarded as compensation to KLG for its losses.

## COUNI V – UNJUST ENRICHMENT

122.   Paragraphs 1 through 121 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, including the Exhibits attached, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear below.

123.   Plaintiff conferred a benefit upon MPF by paying, through SFMG, the salary of MPF on behalf of services that were to have been rendered for the benefit of Plaintiff. The SFMG contract, which MPF was aware of and which was signed by his wife CF, who used her position to put MPF on the payroll to be billed directly to KLG, was a contract under seal with a Statute of Limitations of 20 years.

124.   MPF accepted his salary, but as was later discovered, was not working on behalf of KLG, but was illegally submitting as "campaign

expenses" his law school tuition and associated expenses, including but not limited to even his parking charges.

125.  MPF expended substantial time while charging KLG to designing and carrying out a conspiracy to steal KLG's trade secrets, proprietary information, and Database among other items.

126.  As a result of these past and continuing actions by MPF, the Defendants MPF and FLF have been unjustly enriched to the extent of the illegal billings previously made, and the revenues earned by the FLF through its theft of KLG property, all of which should be reimbursed with interest to KLG, which unjust enrichment is an ongoing activity.

**COUNI VI – 93A – fraudulent deceptive trade practices**

127.  Paragraphs 1 through 126 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, which are incorporated by reference herein.

128.  Both Plaintiff and the Defendants are engaged as business persons in trade and commerce as defined under G.L. c 93A, at all relevant times.

129.  MPF and FLF's theft and continuous use of Plaintiff's trade secrets, Database, and proprietary information and their refusal to return these items, including the establishment of a competing business funded with money stolen from KLG and utilizing KLG's property and Trade Secrets to gain a competitive advantage, constitutes unfair and deceptive trade practices in violation of Chapter 93A.

130.  The Defendants actions as above alleged in conspiring over time to seal Plaintiffs information, hatching and executing and covering up a plot to do so in conjunction with CF, transferring the secret information to themselves to go into competition with KLG, going into competition with KLG and knowingly causing damage to KLG thereby, accepting a salary while utilizing the time to conspire, all constitute malicious and intentional wrongdoing which continues as a scheme implemented over time to this very day, and which has and continues to damage KLG every day.

130a. In conspiring to engage in deceptive and fraudulent trade practices utilized in facilitating and covering up the theft of KLG's proprietary

information, Trade Secrets, and electronic Database, the Defendants acted maliciously, in bad faith, and to generate profit for themselves, resulting in consequent significant financial damage to Plaintiff, and an unfair and unconscionable advantage to the Defendants. The cover up hatched and implemented by the Defendants, continues to this day and has been an ongoing and actively pursued scheme intended to damage the Plaintiff, and which has damaged the Plaintiff.

## Count VII –Breach of Fiduciary Duty

131.   Paragraphs 1 through 130 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear in all paragraphs of the Complaint.

132.   Defendant SFMG was allowed for a fee, and under the supervision and control of Defendant, to have access to sensitive Client data in order to perform services called for in the Contract. After a time, Defendant MPF was hired by SFMG to assist CF in conspiring to seal the sensitive data belonging to KLG, and appropriate it to the use and profit of MPF, FLF, and CF.

133.   Defendants recognized the information as "confidential information" and well knew that the money sent to SFMG to conduct campaigns must be spent in accordance with the standards of prudence and in the good faith which attached to all contracts in the Commonwealth. The Defendant MPF was at all times in a confidential relationship with Plaintiff and his Clients and assumed the role of fiduciaries with respect to the information provided and the money sent and expended.

134.   As above alleged, CF, SFMG and MPF repeatedly represented to the Plaintiffs and each of them that they understood the highly confidential nature of the relationship into which they were entering, and that the metrics created from the advertising campaigns were proprietary and confidential and would damage KLG's business if disclosed.

135.   Pursuant to paragraph 9 of Exhibit A (Agreement") the Defendant SFMG had a duty to "keep confidential" all information which it obtains

under the Agreement and its operation. Such information may not be "used or disclosed" by SFMG both during and after the term of the agreement.

136.   MPF knew the highly confidential nature of the data gathered, the cost of gathering it, and its value to KLG in launching future campaigns, and indeed in obtaining future customers. Instead of honoring the confidentiality of the information and its value, MPF assisted CF in stealing the information and conveying it either directly or indirectly to FLF, a law firm which is under the control of its "Chief Executive Officer" CF, and from which both CF and MPF both profit, especially through utilization of the Database stolen from KLG.

137.   The Defendants and each of them had a duty not to divert funds given to SFMG to personal uses, or to divert confidential information with which they were entrusted. Those funds, and that information were held under a fiduciary duty to be used for the purposes for which they were provided and for no other purposes.

138.   MPF, SFMG, and CF   received over $450,000 from KLG during the month of November 2015 for the purpose of the NFL campaigns and have not invoiced for those funds by way of expenses as is required by the Agreement, and have failed and neglected, despite repeated demand, to account for those funds.

139.   Upon information and belief, some of the fiduciary funds and information stolen by CF and MPF were utilized to capitalize the FLF and to launch it into the business of stealing the KLG customers in breach of the Agreement.

140.   CF, by slight of hand, claims not to have breached the non-competition clauses and proprietary information clauses of the Agreement because she handed the materials to or for the use of MPF and FLF, and apparently believes that "shell game" saves her from responsibility and liability, and has brought MPF and FLF along for the ride on that financial escapade.

141.   The actions of the Defendants as described above constitute a breach of fiduciary duty for which the Defendants must be held to strict account, and under which the Defendants are liable for all damages and the full cost of this action. In conspiring to steal and facilitating the theft of KLG's

26

proprietary information, Trade Secrets, and electronic Database, the Defendants acted maliciously, in bad faith, and to generate profit for themselves, resulting in consequent significant financial damage to Plaintiff, and an unfair and unconscionable advantage to the Defendants which has constituted an ongoing breach of fiduciary duty which the Defendants have actively attempted to conceal until this day.

## Count VIII – Civil Conspiracy

142.   Paragraphs 1 through 141 above are realleged as if fully set forth herein, including all Exhibits, including all Exhibits, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear below.

143.   The Defendants MPF and FLF conspired with SFMG and CF intentionally injure the Plaintiffs by undertaking the following actions in derogation of Plaintiffs rights:

a)     Both refuse to turn over the Database KLG paid for as provided by the Contract;

b)     Both have diverted corporate opportunities from KLG to a law firm owned by her husband and being run by Defendant Feeney;

c)     Both have refused to provide the accounting provided for in the Contract;

d)     Both have diverted funds provided under the Contract for marketing purposes which have been instead diverted for the personal use of Defendant Feeney;

e)     Both refuse to account for the $450,000 of NFL funds given to them on 11/3/2015 which were to have been expended for that campaign;

f)     Both have violated the covenant not to compete and the covenant of secrecy as provided for, and attempted to divert opportunities to the law firm of Feeney's husband which Feeney operates, and has diverted confidential proprietary and highly

confidential lawyer-client information from KLG to others
unauthorized to receive it;

g)    SFMG as directed and controlled by Defendant Feeney, instead
of maintaining the confidence of KLG as required by Paragraph 9 of
the Agreement (Exhibit A to the Complaint, incorporated by reference
herein) diverted and used that information for her own personal
benefit and for the express purpose of benefiting her husband and his
newly established law firm, and thereby to compete with KLG;

h)    SFMG under the direction and control of Feeney further
violated the contract with KLG (Exhibit A, paragraph 11) by taking
Plaintiffs proprietary information and diverting it in order to compete
with KLG to establish Feeney's husband as an expressly competing
business in his law firm, which took place during the term of the
Agreement. The Feeney Law Firm registered its web site in
November of 2015 and began soliciting KLG's Clients soon
thereafter, including hosting a "Bubbly on the Beach" Champagne
party on February 29, 2016 at the AAJ winter convention, for the
specific purpose of soliciting Plaintiffs clients. The event was falsely
advertised to KLG's clients as an "AAJ event by invitation only",
when in fact it was not an AAJ event but one schemed up by
Defendant Feeney to solicit KLG's Clients.

144.   These actions constitute a civil conspiracy on behalf of both
Defendants, acting in concert to accomplish a common objective of
depriving Plaintiffs of their rights, opportunities and property, and to the
considerable damage of the Plaintiffs as above alleged.

145.   Instead of conducting the promised campaign, Defendant Feeney
directed SFMG to divert funds through fraudulently inflated bills, and by
just not even in the end submitting bills, and taking a significant portion of
the NFL campaign money for her own use and for the use of her husband, to
the damage of KLG.

145a. In conspiring to steal and facilitating the theft of KLG's proprietary
information, Trade Secrets, and electronic Database, the Defendants acted
maliciously, in bad faith, and to generate profit for themselves, resulting in
consequent significant financial damage to Plaintiff, and an unfair and
unconscionable advantage to the Defendants which has constituted an

ongoing breach of duty constituting a civil conspiracy, which the Defendants have actively attempted to conceal until this day.

## COUNT IX – Defend Trade Secrets Act – 18 USC 1836.

146.   Paragraphs 1 through 145 above are re-stated as if fully set forth herein, including all Exhibits, including all Exhibits, including the Exhibits attached, which are incorporated by reference herein. Also incorporated by reference are the allegations of the Counts which appear below.

147.   KLG is the owner of a trade secret as that term is used and defined in 18 USC § 1836. The Defend Trade Secrets Act may be enforced in either State or Federal Courts, as for example, the RICO Act.

148.   The trade secrets owned by KLG have been described in detail in the allegations above.

149.   The misappropriation of the trade secrets by the Defendants in this matter was recently verified through electronic mail materials provided by third parties which verified that CF, and more particularly the Defendants herein, had access to and were using the database of the Plaintiffs and the trade secrets contained therein for their own personal gain and profit.

150.   The Defendants herein have been actively engaged in a conspiracy to conceal their use and misappropriation of the trade secrets of the Plaintiffs in conjunction with CF.

151.   The use, misappropriation, and theft of the Plaintiffs' trade secrets have caused the Plaintiffs substantial damages.

152.   The Plaintiffs seek damages for the actual loss caused by misappropriation of the trade secret pursuant to 18 USC 1836(b)(3)(B)(i)(I).

153.   The Plaintiffs seek damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss pursuant to 18 USC 1836(b)(3)(B)(i)(II).

154. In conspiring to steal and facilitating the theft of KLG's proprietary information, Trade Secrets, and electronic Database, the Defendants acted maliciously, in bad faith, and to generate profit for themselves, resulting in consequent significant financial damage to Plaintiff, and an unfair and unconscionable advantage to the Defendants which has constituted an ongoing breach of the Defend Trade Secrets Act, which the Defendants have actively attempted to conceal until this day.

WHEREFORE PLAINTIFFS REQUEST:

A)     That damages be determined, accounted for and paid in full under each and every Count, including costs and attorneys' fees where the law so provides;

B)     That for those Counts allowing for or providing for multiple damages, that under such counts multiple damages and attorneys fees be awarded;

C)     Under the Conversion and Injunctive Relief Counts, that the database with all of its information and functionality, however described, including the Salesforce license paid for by Kyros, be turned over to Kyros, and such damages be assessed as may be provided by law;

D)     That both MPF and FLF, their agents and assigns be prohibited from utilizing the data contained in the database paid for by KLG, including but not limited to all client information and the information concerning campaigns conducted for the benefit of and paid for by KLG and that the Court ORDER this information to be purged from any data base maintained by MPF and/or FLF.

E)     That both MPF and FLF be ordered to retrieve and turn over to KLG any of the data base information paid for by KLG whatever its current form may be

F)     That MF and FLF be required to disgorge all revenues earned through the utilization of any of KLG's property, and to provide a full accounting thereof.

G)    For such other relief as may be just and proper and/or allowed by law under the facts as alleged or as they may be proven at trial or at hearings, or as requested above, whether designated to a particular "Count" or not.


Respectfully submitted:

Kyros Law Group LLC,
By its Attorney,

*/s/ S. James Boumil*          Date: 3/29/21
S. James Boumil, Esq.
Boumil Law Offices
120 Fairmount Street
Lowell, MA  01852
Tel:  978-458-0507
BBO# 050940
E-mail:  SJBoumil@Boumil-Law.com


## JURY TRIAL REQUESTED ON ALL ISSUES
## WHERE AVAILABLE BY LAW

31



**Execution Copy**

## MARKETING AGREEMENT

     This Marketing Agreement (this "Agreement") is made as of January 1, 2011, by and between: (i) Sweet Feeney Marketing Group, LLC, a Massachusetts limited liability company (the "Consultant") and (ii) Kyros Law Group, LLC, a Massachusetts limited liability company (the "Client").

     For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

     1.    **Services.**  Consultant will provide certain services to Client including management of marketing campaigns, enhancement of lead generation, operations, analytics, inventory management, inquiry screening and lead distribution, competitive intelligence and news monitoring (the "Services") as further described in the attached Statement of Work (the "Statement of Work").  Consultant will provide Client with certain deliverables including a database of leads, a series of websites and content for television advertising (collectively, the "Deliverables") as further described on the Statement of Work.

     2.    **Compensation.**  (a)  Client will compensate Consultant for the Services by paying Thirty-Five Thousand Dollars ($35,000) on a monthly basis in arrears for the term of the Agreement (the "Base Fee").  The Base Fee shall be paid on or before the 10th day of each month.

     (b)    In addition to the Base Fee, Client will compensate Consultant by paying an annual bonus equal to thirty percent (30%) of the Net Profits generated by Client during each Fiscal Year (each, an "Annual Bonus").  Client shall pay Consultant the Annual Bonus within 90 days of the closing of the applicable Fiscal Year.  If, following the payment of the Annual Bonus in any given year, Client receives reimbursement from the Financial Sponsor of any Base Fees or Marketing Fees that were included in Aggregate Business Expenses for the prior Fiscal Year, then Client shall adjust the prior calculation of the Annual Bonus accordingly and make any additional payment to Consultant that may be due as the result of such adjustment.  Client shall not enter into a side agreement with a Client affiliated party in order to divert revenue otherwise due to Client.  For the avoidance of doubt, Client is not restricted from (i) modifying or terminating the relationship with the Financial Sponsor at any time and (ii) forming relationships with other sponsor law firms at any time.

     (c)    Consultant will discuss with Client in advance each month's or quarter's budget for Client's marketing campaigns with various vendors including online advertising costs, per click fees and other integrated marketing fees and costs (collectively "Marketing Fees") to reach agreement on a marketing budget and an estimated amount for the Marketing Fees for the period. Consultant shall expend the Marketing Fees for the purpose of generating leads and cases sought by Client, e.g., mesothelioma claims.  Consultant will submit reports or invoices in a format reasonably acceptable to Client requesting reimbursement for the Marketing Fees and Client will reimburse Consultant for the Marketing Fees within thirty (30) days of receipt of the report or invoice.  Client may advance funds to Consultant for the Marketing Fees in Client's sole discretion.  Consultant shall promptly reimburse Client for any Marketing Fees that are refunded or returned to Consultant by any vendor.  Consultant shall only seek reimbursement from Client for expenses at their actual cost without any premium or mark up.

(d)     Upon payment of the Annual Bonus, Client shall provide Consultant with a statement summarizing the calculation of the Annual Bonus and the Net Profit for the applicable Fiscal Year (each, an "Annual Bonus Statement").

(e)     "Aggregate Business Expenses" mean (i) the business expenses reported on Client's tax return for such Fiscal Year; provided that Client shall only include those expenses that relate to its asbestosis/mesothelioma business (and not any other line of business that Client might expand into); provided, further that for purposes of calculating Net Profit such expenses shall not exceed One Million Dollars ($1,000,000) for any Fiscal Year (exclusive of any expenses incurred in connection with responding to or defending any actual or threatened claim, proceeding, suit or investigation against Client including, without limitation, any attorneys' fees or expenses), and (ii) Base Fees and the Marketing Fees paid, advanced or reimbursed by Client in the applicable Fiscal Year. For the avoidance of doubt, any Base Fees or Marketing Fees that are paid, advanced or reimbursed by the Financial Sponsor shall not be included in "Aggregate Business Expenses".

(f)     "Financial Sponsor" means any law firm that funds Client's business activities including the advancement of Base Fees and Marketing Fees.

(g)     "Fiscal Year" means the calendar year, except for the last Fiscal Year which shall be measured from January 1 of that year through the effective date of termination or expiration of this Agreement.

(h)     "Net Profits" mean with respect to the applicable Fiscal Year the Net Revenues collected by Client in such year less the Aggregate Business Expenses for such year.

(i)     "Net Revenues" means the gross revenues paid to Client attributable to leads generated by Consultant. For the avoidance of doubt, any Base Fees or Marketing Fees that are paid, advanced or reimbursed by the Financial Sponsor shall not be included in "Net Revenues".

3.      **Late Payment, Fees and Interest.**  Any fees, charges or reimbursements properly submitted, due and unpaid shall bear interest at the rate of 10% per annum until paid in full.

4.      **Recordkeeping and Audit Rights.**  (a)  For a period not less than the term of the Agreement plus two (2) years thereafter, (i) Client shall keep accurate books of accounts and records relating to its revenues and expenses and (ii) Consultant shall keep accurate records relating to the payments received from Client and the expenses it submitted to Client.  In connection with any audit of its books and records Client will provide Consultant with a copy of any referral arrangements or similar relationships with any Financial Sponsor or person to whom Client refers any leads generated by Consultant.

(b)     Each party shall have the right to audit the other party's books and records once every 12 month period to verify the accuracy of the Annual Bonus Statement in the case of Consultant, and to verify the completeness of the lead database, the accuracy of the submitted expenses and the receipt of payments in the case of Client; provided that in each case (i) the party initiating the audit (the "Auditing Party") shall provide the other party with at least 20 days advance notice, (ii) the Auditing Party shall limit its on-site audit to 3 consecutive business days

and (iii) the Auditing Party shall cease all audit-related requests 20 days after the start of the audit (assuming compliance by the party subject to the audit).

5.      **Term and Termination.**  (a) The term of this Agreement shall be five (5) years starting on the date hereof (the "Effective Date").  Upon mutual agreement, the parties may renew or extend this term.

(b)      Either party may terminate this Agreement, at any time, for convenience on thirty (30) days prior written notice, which notice shall specify the exact date of termination.  Either party may terminate this Agreement for Cause upon five (5) days written notice to the other party.

(c)      "Cause" means the other party's breach of any term or condition of this Agreement or the Statement of Work unless such breach by its nature is curable and is cured within five (5) days after receiving notice of such breach.

6.      **Effect of Termination.**  In the event this Agreement expires upon its own terms or is terminated by Consultant for Cause or by Client for convenience, then Consultant shall remain eligible to receive the Annual Bonus for leads generated by Consultant during the term for a period of two years from the termination of this Agreement (the "2-year Tail Period"); provided, however, that with respect to the final Fiscal Year the Annual Bonus will be pro-rated based on the date of termination of this Agreement.  For example, if the effective date of termination is on the 270th day of the year, then the Annual Bonus for that year would be multiplied by the ratio of 270/365 to determine the amount payable to Consultant for that year. In the event the tail period applies, then each party's right to audit as described in Section 4 shall last until the 2-year Tail Period expires.

7.      **Representations and Warranties.**  (a)  Consultant represents and warrants to Client that: (i) it has the authority to enter into this Agreement and is not restricted from performing hereunder; (ii) by entering this Agreement it will not be in contravention or in conflict with any other agreement to which it is a party; (iii) it will comply with applicable law; (iv) it will provide Services in a professional manner consistent with the highest industry standards; and (v) the Services and the Deliverables do not violate the intellectual property rights of any party.

(b)      Client represents and warrants to Consultant that: (i) it has the authority to enter into this Agreement and is not restricted from performing hereunder; (ii) by entering this Agreement it will not be in contravention or in conflict with any other agreement to which it is a party; and (iii) it will comply with applicable law.

8.      **Intellectual Property.**  (a) Except as set forth in the Statement of Work, Consultant hereby assigns to Client all right, title, and interest in and to any inventions (patentable or otherwise), discoveries, improvements or copyrightable works including, without limitation, the Deliverables (collectively, "Intellectual Property") which Consultant delivers or creates in connection with its performance of Services hereunder.  At Client's expense, Consultant shall provide all reasonable assistance requested by Client in its protection of the Intellectual Property.

3

(b)      As part of the Services, Consultant tracks and monitors the effectiveness of the marketing campaigns on the web and on television by, among other things, using certain software tools (the "Consultant Software Tools"). Upon request, Consultant shall provide Client with access to the information garnered from analyzing the success of the marketing campaigns, including keyword to conversion data and detailed account information available through Google AdWords, Bing and similar resources. On a monthly basis, Consultant shall provide Client with a digital file containing a then-current compilation of the lead database exported in a standard available format that Client can upload to its own licensed copy of Salesforce.com. In addition, Consultant shall provide Client with its own login so Client can access the database at any time. Upon request, Consultant shall provide Client with access to the Consultant Software Tools. In addition, Consultant shall provide Client with written instructions regarding the use of the Consultant Software Tools and shall provide in-person training to Client from time to time as requested by Client to ensure Client can operate the Consultant Software Tools effectively. Consultant shall not in any way impair Client's access to and use of the Consultant Software Tools or Client's ability to process any lead.

(c)      Client may also use certain software tools from time to time to track the effectiveness of its marketing campaigns on the web (the "Client Software Tools"). Upon request, Client shall provide Consultant with access to the information garnered from analyzing the success of the marketing campaigns, including keyword to conversion data and detailed account information available through Google AdWords, Bing and similar resources. Upon request, Client shall provide Consultant with access to the Client Software Tools. In addition, Client shall provide Consultant with written instructions regarding the use of the Client Software Tools and shall provide in-person training to Consultant from time to time as requested by Consultant to ensure Consultant can operate the Client Software Tools effectively. Client shall not in any way impair Consultant's access to and use of the Client Software Tools.

(d)      Notwithstanding Section 8(a) and Section 9, (i) Consultant has the right to re-use any of its know-how, ideas, concepts, methods, processes, or similar information, (ii) Consultant retains ownership of any and all of its intellectual property rights that existed prior to the Effective Date including, but not limited to, all methods, concepts, designs, reports, programs, and templates; provided, however, that Consultant hereby licenses such intellectual property to Client on a worldwide, assignable, royalty-free and irrevocable basis during the term of this Agreement plus the twelve (12) month period following its termination or expiration.

9.      **Confidential Information.** Each party hereto (each, a "Recipient") shall protect and keep confidential all non-public information disclosed to Recipient by the other party (each, a "Discloser") and identified as confidential by Discloser ("Confidential Information"), and shall not, except as may be authorized by Discloser in writing, use or disclose any such Confidential Information during and after the term of this Agreement. These obligations of confidentiality shall not apply to information that: (i) was previously known to Recipient; (ii) is or becomes publicly available, through no fault of Recipient; (iii) is disclosed to Recipient by a third-party having no obligation of confidentiality to Discloser relating to such Confidential Information; (iv) is independently developed by Recipient; or (v) is required to be disclosed by order of law. For the avoidance of doubt, Confidential Information shall be deemed to include (A) this Agreement and its attachments and (B) any information made available during the course of any audit.

12769511v.16

10.   **Indemnification.**  Consultant shall indemnify, hold harmless and defend Client from and against any and all judgments, liabilities, damages, losses, expenses and costs (including, but not limited to, court costs and reasonable attorney fees) (collectively, "Indemnification Expenses") incurred by Client that arise from or relate to: (i) any breach of this Agreement by Consultant; and (ii) the violation of any third-party's intellectual property rights arising in connection with the provision of Services, and/or the Deliverables.  Client shall indemnify, hold harmless and defend Consultant from and against any and all Indemnification Expenses incurred by Consultant that arise from or relate to any breach of this Agreement by Client.

11.   **Non-Competition and Non-Solicitation.**  (a)  During the term of this Agreement, Consultant, on behalf of itself and its affiliates, shall not provide any similar Services or Deliverables to any other party that is, directly or indirectly, engaged in the business of generating revenues from leads or claims relating to or arising from asbestosis, mesothelioma or otherwise based on exposure to asbestos ("Competitive Conduct").  In addition, in the event Consultant terminates this Agreement for convenience or Client terminates for Cause, then Consultant, on behalf of itself and its affiliates, shall not engage in any Competitive Conduct, directly or indirectly, during the one (1) year period commencing upon the termination or expiration of this Agreement.

(b)   During the term of this Agreement and during the one (1) year period commencing upon the termination or expiration hereof, Consultant, on behalf of itself and its affiliates, shall not, directly or indirectly, solicit or hire current or former employees or independent contractors of Client, without Client's prior written consent in each case.

(c)   During the term of this Agreement and during the one (1) year period commencing on the termination or expiration hereof, Consultant, on behalf of itself and its affiliates, shall not, directly or indirectly, solicit or divert any business from Client including, without limitation, any leads generated as a result of Consultant's efforts during the term of this Agreement.

12.   **Covenants.**  Consultant will not make any false or misleading statement including the omission of a material fact in any information posted or published concerning Client; provided that Consultant shall not be responsible for false or misleading statements that were provided by Client to Consultant for publication or distribution.  Consultant shall cause any such publication or communication to include the name of Client, its office address and bar admission in the Commonwealth of Massachusetts.  Consultant will keep copies of all advertising materials or communications created for Client for at least two (2) years from the date of publication or dissemination, along with a record of where and when it was used.  Consultant acknowledges that the ethical requirements of states other than Massachusetts may be deemed to apply to Client and Consultant shall comply with such requirements following notice and direction from Client regarding how to comply with such requirements.  Consultant shall not engage in the practice of law.  Consultant shall not solicit any business for Client or customers of Client.  Consultant acknowledges that Client may visit Consultant on-site from time to time after reasonable notice of not less than 24 hours to assess Consultant's compliance with this Section 12.  Consultant shall reasonably cooperate with Client in connection with such assessments.

5

13.   **Key Employee.**  Consultant shall retain Christina Fay on a full-time basis to provide Services hereunder for the duration of the term.

14.   **Delays.**  Neither party shall be liable for delays caused by fire, war, insurrection, riot, act of God, or any other cause reasonably beyond its control; but each party shall use all reasonable efforts to minimize the extent of any such delay.

15.   **Insurance.**  (a) Consultant shall purchase and maintain in force and effect for the term, and any extension thereof, insurance coverage of the types and with limits of not less than those set forth in Section 15(b) below, with insurers having A.M. Best ratings of at least A-. Upon Client's request, Consultant shall cause all insurance companies issuing such policies of insurance to provide certificates of insurance to Client to confirm that such coverages are currently in effect.  The certificates of insurance shall indicate that the insurers will provide at least 30 days advance written notice of cancellation or non-renewal to Client.

(b)     (1) Workers' Compensation with statutory limits and Employer's Liability with a limit of not less than $100,000, if Consultant is required by applicable law to purchase such insurance; (2) Commercial General Liability including coverage for Consultant's vicarious liability for actions of independent contractors, damages arising from products or completed operations, blanket Contractual Liability insuring the indemnification provision of this Agreement, Personal Injury Liability, and Property Damage Liability with required limits for bodily injury and property damage combined of $1 million per occurrence and $2 million in the aggregate; (3) Automobile Liability including coverage for schedule, non-owned, and hired vehicles with limits not less than $1 million combined single limit per accident for bodily injury and property damage and all legally required insurance shall be maintained on vehicles used in connection with work performed under this Agreement, if any; (4) Errors & Omissions/Professional Liability in the amount of $1 million per claim and $3 million in the aggregate, and (5) Umbrella Liability above the Commercial General Liability, Employers Liability, Errors & Omissions and Automobile Liability with limits not less than $5 million per occurrence and in the aggregate.

16.   **Independent Contractor Status.**  The parties hereto are independent contractors. Nothing in this Agreement shall be deemed to create any form of partnership, principal-agent relationship, employer-employee relationship, or joint venture between the parties hereto.

17.   **Assignment and Subcontracting.**  Neither party may assign its rights or delegate its obligations hereunder without the prior written consent of the other party.

18.   **Waiver.**  Neither party shall be deemed to have waived any right hereunder unless such waiver is in writing and executed by a duly authorized officer of the waiving party. No waiver by either party of any right hereunder shall constitute a waiver of any right on any other occasion.

19.   **Separability.**  The invalidity or unenforceability, in whole or in part, of any provision, term, or condition hereof shall not affect the validity or enforceability of the remainder of such provision, term or condition or of any other provision, term, or condition.

6

12769511v.16

20.   **Governing Law.**  This Agreement will be governed by the laws of the Commonwealth of Massachusetts without regard to its rules concerning conflicts of laws.

21.   **Interpretation.**  Captions of the sections of this Agreement are for reference purpose only and do not constitute terms or conditions hereof.  Each party acknowledges that it has received advice from legal counsel, thoroughly reviewed this Agreement and bargained over its terms.  Accordingly, neither party shall be considered responsible for the preparation of this Agreement, which shall be deemed to have been prepared jointly by both parties.  The provisions of the Agreement allocate the risks between the parties.  The terms and conditions included herein reflect this allocation of risk, and each provision herein is part of the bargained-for consideration of this Agreement.

22.   **Survival.**  The terms and provisions of Sections 2, 3, 4, 6, 8, 9, 10, 11 and 12 shall survive expiration or termination of this Agreement.

23.   **Entire Agreement.**  This Agreement and any incorporated Statement(s) of Work constitute the entire agreement between Client and Consultant and supersede any prior agreements or understandings including, without limitation, the Memorandum of Understanding dated June 9, 2010.  In the event that any provisions in any incorporated Statement(s) of Work are in conflict with the provisions in this Agreement, then the provisions in this Agreement shall prevail over any such conflicting provisions.  This Agreement or any Statement of Work may not be amended unless such amendment is in writing and signed by both parties hereto.

24.   **Notices.**  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed to have been received by a party when actually received in the case of hand delivery, or two (2) days after mailing by a nationally-recognized overnight carrier, to each party at the addresses shown below.

If to Consultant, then to:

Sweet Feeney Marketing Group, LLC
70 Sumner Street
Dorchester, MA  02125

If to Client, then to:

Kyros Law Group, LLC
17 Miles Road
Hingham, MA 02043

with a copy to:

Seyfarth Shaw LLP
World Trade Center East
Two Seaport Boulevard, Suite 300
Boston, MA  02110-2028
Attention:  Ronan P. O'Brien

25.   **Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12769511v.16

**IN WITNESS WHEREOF**, each party has caused this Agreement to be executed by its respective duly authorized representative as of the date first set forth above.

**Kyros Law Group, LLC**

By: _____

Name: KONSTANTINE KYROS

Title: Owner

**Sweet Feeney Marketing Group , LLC**

By: _____

Name: _____

Title: _____

12769511v.16

**IN WITNESS WHEREOF**, each party has caused this Agreement to be executed by its respective duly authorized representative as of the date first set forth above.

Kyros Law Group, LLC                          Sweet Feeney Marketing Group , LLC

By: _____                       By: _____

Name: _____                     Name: _Andrew Sweet_

Title: _____                    Title: _Manager_

12769511v.16

EXHIBIT

B

ALL-STATE LEGAL®

Draft: Confidential Memo

RE: Kyros Law Offices/Sweet Marketing Group

### MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is entered in to this __9th__ day of June, 2010, Kyros Law Offices (hereinafter, "Kyros") and Sweet Marketing Group (Andy Sweet, Christina Fay (hereinafter, "Sweet/Fay")). It is understood that this agreement is to serve until Kyros establishes a business structure that gives Sweet and Fay stock appreciation rights/ and or phantom stock, at which point the parties agree negotiate a new contract in good faith consistent with the terms of this agreement.

WHEREAS Kyros and Sweet/Fay are both desirous creating a business relationship all parties agree to the following:

1. Sweet/Fay will be responsible for managing online and television marketing campaigns designed and executed by Sweet/Fay to generate new business, specifically asbestos and mesothelioma cases. Sweet/Fay will develop cost effective marketing solutions by employing database management tools, media cost monitoring, tracking technologies, PPC strategies, targeted web sites, social networking and all available online, television and media sources to get new clients for Kyros. Sweet/Fay will also manage data from these contacts, create a database of the law firm clients and provide consulting on technology related matters. Specifically Sweet and Fay will be responsible for database management, media buys, call center set up, online lead generation, web analytics, inventory management, technology that aids in lead distribution, quality assurance and competitive intelligence/news monitoring.

2. For consideration for services as above Kyros will pay Sweet/Fay $35,000 per month. Kyros will also hereby assign to Sweet/Fay an interest in Kyros Law Offices to be determined as a percentage of revenue generated from case generation efforts in which they were involved. This will be granted as is ethical and legal pursuant to a structure of

stock appreciation rights or phantom stock as appropriate. Kyros agrees to pay Sweet/Fay 30% of the total net revenue of the asbestos/mesothelioma department of the law firm.

3. Both parties agree to work together as a collaborative team to develop new strategies, new product types and better approaches to law firm marketing practices. They agree to not share confidential and proprietary information about these practices and employ good faith and fair dealing with one another at all times.

4. If in the event the parties decide to end their business relationship either party may cancel after the initial 12 months. The stock appreciation rights accumulated will survive until such revenue is received, the $35,000 monthly fee will cease on date of termination.

5. Sweet/Fay will furnish copies of their respective employment agreements with any previous employer for Kyros to review. Upon review and acceptance, Kyros will agree to pay any legal expenses Sweet/Fay may incur if a previous employer brings legal process against Sweet/Fay.

6. While the agreement is in effect Sweet/Fay's work will be exclusive to Kyros and Sweet/Fay will not work for another law firm during this period except with written permission from Kyros.

7. All parties agree that this memo, contract terms and all relevant detail are confidential.

Konstantine Kyros
Kyros Law Offices, PC

_____manager_____
Andrew Sweet
Sweet Marketing Group

Christina Fay
Sweet Marketing Group



EXHIBIT

C

ALL-STATE LEGAL®

## Statement of Work to Marketing Agreement

**I.   Services:**

A.  Lead Generation:

Consultant will use a wide variety of tactics to generate qualified leads for Client via the internet, including pay per click advertising, organic search engine optimization, and social media.  Consultant will manage current marketing efforts and expand into untapped areas.  Consultant is very familiar with the unique rules involved with the marketing of legal services and do everything in its power to avoid unnecessary risks.

In addition to digital marketing, Consultant will run a highly detailed, integrated television campaign in support of its digital efforts.  Consultant will develop and execute a television strategy based on a specified budget, with a clear focus on cost per lead and cost per signed case.  Consultant's depth of knowledge allows it to handle the following:

- Creation of multiple television ads for testing with varying messaging and length (30 & 60 second spots)
- Media planning, including testing on national cable, network, syndication & per inquiry platforms.  In addition, Consultant will create media plans designed to deliver leads at the lowest possible cost based on station selection, time of day and frequency.
- Daily tracking and optimization to ensure maximum efficiency (see "Analytics" below for more detail).

Within the offline area, Consultant also has expertise in direct mail, radio, and print advertising.

B.  Operations:

An effective internal operations process is key to expansion into other media.  A well-designed and smoothly operating process will eliminate lost leads and maximize spending efficiencies.  Consultant will create and implement a process with 'full-funnel' accountability from marketing and intake through analysis and analytics.

C.  Analytics:

Consultant believes that no marketing can ever be done efficiently without a thorough understanding of the circumstances influencing performance.  Consultant will gather and organize multiple variables through web and call tracking to identify trends in order to optimize performance, attacking hot spots, improving conversion rates and reducing waste.  Consultant uses the following Consultant Software Tools: Salesforce, Excel, Google Analytics, Mongoose Metrics.  Client

uses the following Client Software Tools: None

D. Inventory:

Consultant will create a database to log, monitor, and update the status of leads, along with capturing pertinent information on each lead or case.

E. Inquiry Screening & Lead Distribution:

Accurate and real-time distribution of leads to appropriate parties is a must. Consultant will provide front line filtration to prevent partners from being inundated with low quality leads through rule based automation on web forms. Consultant will also assist in establishing a system to handle increased call volume. Consultant will deliver highly qualified potential cases.

Consultant also understands that generating mesothelioma cases is a highly competitive market and first impression with a potential client must be of the highest quality, so as not to lose a potential case. Consultant's screening process will not only be scalable but also best-in-class.

F. Competitive Intelligence:

In a highly competitive space such as legal marketing, keeping an eye on your neighbor is crucial—not only to plan campaigns, but also to seize upon new opportunities. Consultant will use numerous tactics to monitor competitors' performance as well their strategy. Do they have a new area of focus? Are they trying a new channel? Have they made a change in their internal management? If so, Consultant will know.

G. News Monitoring:

Along with monitoring competitors, Consultant will also monitor new developments related to existing marketing activities and potential new products. Using Google Alerts, RSS feeds and social media monitoring tools, Consultant will adjust tactics on the fly in order to reach new clients and utilize new technologies.

## II. **Deliverables:**

A. Websites:

Consultant shall build inquiry conversion focused websites around mesothelioma and asbestos subject matter.

B. Content:

Consultant shall design content to be lead generation focused.

C. Database:

Consultant shall use Salesforce.com as the database and it will be maintained through an annual license. Technical support will be provided as part of the license fee.

D. Call Center:

Consultant shall outsource call center service that will handle incoming calls from TV and websites as well as provide outbound follow-up calls.

12769511v.16

**III. <u>Other Matters</u>:**     Consultant shall prepare and deliver to Client a forecast that sets forth the one-year, three-year and five-year estimates of leads that Consultant anticipates generating for Client.  Client acknowledges that this report contains merely estimates and does not constitute a guarantee.





# Christina Feeney

## Chief Executive Officer

## Call: 1-800-809-0911

## Email: cfeeney@feeneylawfirm.com

---

For over 15 years Christina has been helping thousands of people get the legal representation and help they deserve. She is responsible for the development of hundreds of marketing campaigns aimed at awareness and education so that victims better understand their rights and legal options. Her extensive experience in mass tort, toxic tort, corporate fraud and the consumer protection legal areas provides her with an expansive knowledge across a large number of case types; so she really understands what our clients are going through.

In her role as CEO, Christina draws upon her extensive experience in overseeing media channels including local and national TV, web, direct mail, social media, radio and print advertising. She has worked with a number of prominent national law firms to create and implement marketing campaigns with a focus on performance accountability, scalable efficiency and consistent



2

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2182CV00280 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

COUNTY  Norfolk Superior Court (Dedham)

| Plaintiff       Kyros Law Group, LLC | Defendant       Michael Patrick Feeney and Feeney Law Firm |
|---|---|
| ADDRESS:       17 Miles Road | ADDRESS:       332 Victory Road, 3rd Floor |
| Hingham MA 02043 | Quincy MA 02171 |
| | |
| Plaintiff Attorney:    S. James Boumil, Esq. | Defendant Attorney: |
| ADDRESS:       120 Fairmount Street | ADDRESS: |
| Lowell, MA 01852 | |
| Tel: 978-458-0507  Email: SJBoumil@Boumil-Law.com | |
| BBO:       050940 | BBO: |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO.       BD2 | TYPE OF ACTION (specify)   Proprietary Information and Trade Secrets | TRACK   A | HAS A JURY CLAIM BEEN MADE?   ☒ YES   ☐ NO |
|---|---|---|---|

*If "Other" please describe:

Is there a claim under G.L. c. 93A?           Is there a class action under Mass. R. Civ. P. 23?
☒ YES   ☐ NO                                    ☐ YES   ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date

   1. Total hospital expenses

   2. Total doctor expenses

   3. Total chiropractic expenses

   4. Total physical therapy expenses

   5. Total other expenses (describe below)

**RECEIVED**

E-Filed 3/29/2021

                             Subtotal (1-5):       **$0.00**

B. Documented lost wages and compensation to date

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses

E. Reasonably anticipated lost wages

F. Other documented items of damages (describe below)

Stolen Database and Trade Secrets

                          TOTAL (A-F):       $5,000,000.00   $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Wrongful solicitation of customers and theft of Intellectual Property | |
| | Total | $5,000,000.00 |

| Signature of Attorney/Unrepresented Plaintiff: X    /s/ S. James Boumil, Esq., for Plaintiff | Date:       March 29, 2021 |
|---|---|

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

Kyros et al v Feeney et al  Norfolk Superior Court  Docket No. 1682CV00100

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney/Unrepresented Plaintiff: X    /s/ S. James Boumil, Esq., for Plaintiff | Date:       March 29, 2021 |
|---|---|

RECEIVED     E-filed 5/20/2021

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                          SUPERIOR COURT DEPARTMENT
                                      CIVIL ACTION NO.: 2018-CV-00280

_____
                                     )
KYROS LAW GROUP LLC,                 )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )
                                     )
MICHAEL PATRICK FEENEY and           )
FEENEY LAW FIRM                      )
                                     )
        Defendants.                  )
_____)


## STIPULATION OF TIME TO RESPOND TO COMPLAINT

       The undersigned counsel hereby stipulate that Defendants have until June 21, 2021 to

answer, move or otherwise respond to Plaintiff's Complaint.


Respectfully submitted,              Respectfully submitted,
Plaintiff,                           Defendants,
By its attorney,                     By their attorneys,


/s/ S. James Boumil[1]               /s/ Marc E. Finkel
S. James Boumil, BBO #050940         Jeffrey L. Alitz, BBO #553741
Boumil Law Offices                   Marc E. Finkel, BBO #659681
120 Fairmount Street                 Freeman Mathis & Gary, LLP
Lowell, MA 01852                     60 State Street, 6th Floor
Tel: (978) 458-0507                  Boston, MA 02109
sjboumil@boumil-law.com              Tel:  (617) 963-5966
                                     jalitz@fmglaw.com
                                     mfinkel@fmglaw.com


Dated: May 20, 2021
_____
[1] Counsel for Defendants electronically signed this Stipulation on behalf of Plaintiff's counsel with counsel's
approval.

**CERTIFICATE OF SERVICE**

The undersigned counsel of record hereby certifies that on this 20th day of May 2021, I served the within document by electronic mail and/or by mailing a copy first-class, postage prepaid, to:

S. James Boumil, Esq.
Boumil Law Offices
120 Fairmount Street
Lowell, MA 01852
sjboumil@boumil-law.com

/s/ *Marc E. Finkel*
Marc E. Finkel

2

**RECEIVED**    E-Filed5/20/2021

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                                CIVIL ACTION NO.: 2018-CV-00280

KYROS LAW GROUP LLC,                )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
MICHAEL PATRICK FEENEY and          )
FEENEY LAW FIRM                     )
                                    )
            Defendants.             )
                                    )

### APPEARANCE OF COUNSEL

Please enter my appearance as counsel for Defendants, Michael Patrick Feeney and

Feeney Law Firm in the above-captioned matter.

Respectfully submitted,

/s/ Marc E. Finkel
Marc E. Finkel, BBO# 659681
Freeman Mathis & Gary, LLP
60 State Street, Suite 600
Boston, MA 02109
Tel:  (617) 807-8951
Fax: (770) 937-9960
mfinkel@fmglaw.com

Dated:  May 20, 2021

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel of record hereby certifies that on this 20th day of May 2021, I served the within document by electronic mail and/or by mailing a copy first-class, postage prepaid, to:

S. James Boumil, Esq.
Boumil Law Offices
120 Fairmount Street
Lowell, MA 01852
sjboumil@boumil-law.com

/s/ *Marc E. Finkel*
Marc E. Finkel

2

RECEIVED          E-Filed5/20/2021

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                          SUPERIOR COURT DEPARTMENT
                                      CIVIL ACTION NO.: 2018-CV-00280

|  |  |
|---|---|
| KYROS LAW GROUP LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| MICHAEL PATRICK FEENEY and | ) |
| FEENEY LAW FIRM | ) |
|  | ) |
| Defendants. | ) |

### APPEARANCE OF COUNSEL

Please enter my appearance as counsel for Defendants, Michael Patrick Feeney and

Feeney Law Firm in the above-captioned matter.

Respectfully submitted,

/s/ Marc E. Finkel
Marc E. Finkel, BBO# 659681
Freeman Mathis & Gary, LLP
60 State Street, Suite 600
Boston, MA 02109
Tel:  (617) 807-8951
Fax: (770) 937-9960
mfinkel@fmglaw.com

Dated:  May 20, 2021

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel of record hereby certifies that on this 20th day of May 2021, I served the within document by electronic mail and/or by mailing a copy first-class, postage prepaid, to:

S. James Boumil, Esq.
Boumil Law Offices
120 Fairmount Street
Lowell, MA 01852
sjboumil@boumil-law.com

/s/ *Marc E. Finkel*
Marc E. Finkel

2

50

(TO PLAINTIFF'S ATTORNEY:     PLEASE CIRCLE TYPE OF ACTION INVOLVED:
                              TORT - MOTOR VEHICLE TORT - CONTRACT -
RECEIVED & FILED              EQUITABLE RELIEF - OTHER)

2021 MAY 24  AM 10: 17

CLERK OF THE COURT  COMMONWEALTH OF MASSACHUSETTS
NORFOLK COUNTY
NORFOLK, ss.   5/25/21

                                              SUPERIOR COURT
                                              CIVIL ACTION

                                         NO. 2182CV00280

        Kyros Law Group, LLC
        _____, *Plaintiff(s)*


                         v.

        Michael Patrick Feeney et al
        _____, *Defendant(s)*


                           **SUMMONS**

To the above-named Defendant: Michael Patrick Feeney, 332 Victory Road, 3rd Floor
                              Quincy, MA  02169
         You are hereby summoned and required to serve upon  S. James Boumil
plaintiff's attorney, whose address is  120 Fairmount Street, Lowell, MA 01852
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.


         Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.


WITNESS,  JUDITH FABRICANT, Esquire  }, at _____ the  8th

day of _____April_____, in the year of our Lord two thousand and  21.


                                                        _____ *Clerk.*

NOTES:
1.  This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all such defendants should appear in the caption.
    If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

## PROOF OF SERVICE OF PROCESS

 **Norfolk County Sheriff's Office**, P.O. Box 699245, Quincy, MA 02269 / Tel. (781) 326-7271
**Norfolk, SS**

May 11, 2021

I hereby certify and return that on 5/1/2021 at 9:30 AM I served a true and attested copy of the summons, complaint and civil action cover sheet in this action in the following manner: To wit, by delivering in hand to Michael Patrick Feeney at 332 Victory Road Thrid floor Quincy, MA 02169 . Attestation - 1 Copy ($5.00) Basic Service Fee ($30.00) Conveyance ($1.50) Postage and Handling ($1.00) Travel ($4.16) Total: $41.66 .

*Paul Donoghue*

**Deputy Sheriff Paul Donoghue**

**Deputy Sheriff**

, 20

---

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.            SUPERIOR COURT
                       CIVIL ACTION
                       NO. 2182CV00280

Kyros Law Group, LLC .................., *Plaintiff*

v.

Michael Patrick Feeney et al .................., *Defendant*

**SUMMONS**

**(Mass. R. Civ. P.4)**

(TO PLAINTIFF'S ATTORNEY:   PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 2182CV00280

5/24/21
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
5/25/21

Kyros Law Group, LLC
_____, *Plaintiff(s)*

v.

Michael Patrick Feeney et al
_____, *Defendant(s)*

### SUMMONS

To the above-named Defendant:   Feeney Law Firm, 332 Victory Road, 3rd Floor,
Quincy, MA 02169

You are hereby summoned and required to serve upon   S. James Boumil
plaintiff's attorney, whose address is   120 Fairmount Street, Lowell, MA 01852,
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

WITNESS,   JUDITH FABRICANT, Esquire, at _____ the   8th

day of   April   _____, in the year of our Lord two thousand and   21.

_____ *Clerk.*

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption.
   If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ........................................, 20      , I served a copy of
the within summons, together with a copy of the complaint in this action, upon the within-named
defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

.................................................................................................................................................

.................................................................................................................................................

.................................................................................................................................................

Dated: ................................, 20      .................................................................................

**N.B.   TO PROCESS SERVER:-**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN**
**THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON**
**DEFENDANT.**

| , 20 |
|---|



 **Norfolk County Sheriff's Office**, P.O. Box 699245, Quincy, MA 02269 / Tel. (781) 326-7271
**Norfolk, SS**

May 11, 2021

I hereby certify and return that on 5/1/2021 at 9:31 AM I served a true and attested copy of the
summons, complaint and civil action cover sheet in this action in the following manner: To wit, by
delivering in hand to Michael Patrick Feeney, Owner, person in charge at the time of service for
Fenney Law Firm, at 332 Victory Road Quincy, MA 02169 . Attestation - 1 Copy ($5.00) Basic
Service Fee ($30.00) Postage and Handling ($1.00) Total: $36.00

*Paul Donoghue*

**Deputy Sheriff**

Deputy Sheriff  **Paul Donoghue**